AMOCO OIL COMPANY; Atlantic Terminal Corporation; Bath Iron Works Corporation; B.P. Oil Company; C.H. Sprague & Son Company; Central Maine Power; Champion International Corporation; Chevron, U.S.A., Inc.; Fairchild Semiconductor Corporation; General Electric Company; Georgia–Pacific Corporation; Maine Yankee Atomic Power Company; Seacoast Ocean Services, Inc.; Titan Corporation; and Weyerhaeuser Company, Plaintiffs,

v.

Richard A. DINGWELL d/b/a The McKin Company, Defendant.

Civ. No. 87–0329–P.

United States District Court, D. Maine.

July 27, 1988.

William P. Skinner, William F. Greaney, Covington & Burling, Washington, D.C., Lawrence C. Winger, Herbert H. Bennett & Associates, Portland, Me., for plaintiffs.

Richard P. Romeo, Smith & Elliott, Saco, Me., for defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

Currently before the Court are Plaintiffs' Motion for Entry of Consent Judgment and three separately filed motions to intervene by Defendant's insurers.

### I. *Background*

Defendant Richard A. Dingwell, d/b/a The McKin Company ("Dingwell"), owned and operated a landsite in Gray, Maine, which is now listed by the United States Environmental Protection Agency as a "Superfund" site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, *et seq.* Plaintiffs are a group of fifteen companies ("the McKin Generator Group" or "the Group") which disposed of their hazardous waste at Dingwell's landsite.

The Travelers Indemnity Company and Charter Oak Fire Insurance Company ("Travelers"), American Policyholders Insurance Company ("API"), and Chicago Insurance Company issued liability insurance policies to Dingwell. The insurers have filed separate motions to intervene as defendant counterclaimants and cross-claimants pursuant to Federal Rule of Civil Procedure 24(a) and (b),[1] and for a stay of this action pending the adjudication of a previously filed declaratory judgment action captioned *Travelers Indemnity Company v. Dingwell,* No. 87–0288–P ("the *Travelers* action").

In 1977, the Town of Gray directed Dingwell to cease operations after learning that several drinking wells near the site were contaminated with hazardous wastes. The Maine Department of Environmental Protection ("DEP") filed suit against Dingwell in 1978 to compel him to finance the cleanup of the site. The DEP and the United States Environmental Protection Agency ("EPA") installed monitoring wells around the perimeter of the site, removed liquid wastes from above-ground holding tanks and drums, and removed crushed drums. In 1985, the EPA issued a Record of Decision ("ROD") specifying the remedial action that the EPA required to address the environmental contamination. The EPA also notified Dingwell, Plaintiffs, and others that they are strictly, jointly, and severally liable under section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for all costs incurred in the investigation and cleanup at the site.

In order to avoid prolonged litigation with the EPA and DEP, some of the Plaintiffs spent approximately $6,000,000 in financing the initial phase of the remedial action. The Plaintiffs and other settling parties have also signed a proposed Consent Decree with the EPA and DEP, under which Plaintiffs will finance the remainder of the remedial action required by the ROD. The cost of the remaining remedial action is estimated at $2,790,000. The Consent Decree further provides that Plaintiffs and other settling parties will pay the United States and the State of Maine an additional $3,000,000 for natural resource damages, cleanup costs incurred by the governmental agencies, and administrative expenses. Thus, the total cost of complying with the terms of the Consent Decree is approximately $12,430,000.

Dingwell's insurers agreed to provide a defense to Dingwell, but expressly reserved all rights to deny indemnification for any and all damages for which Dingwell may be held liable. With the insurers' knowledge, Plaintiffs and Dingwell undertook settlement negotiations and eventually signed a Settlement Agreement. The Agreement provides that Dingwell will join the Consent Decree, pay sixty-five percent of the cost of the cleanup, consent to entry of a judgment requiring him to comply with the Settlement Agreement, and cooperate with Plaintiffs in any action by the Plaintiffs to enforce the Settlement Agree-

---

1. Only Travelers and API seek permissive intervention pursuant to Rule 24(b) in addition to intervention as of right under Rule 24(a). Although they are at risk for varying degrees of liability exposure, all three applicants have advanced substantially the same, or at least overlapping, interests in this litigation. For purposes of efficiency and clarity, the Court shall hereinafter refer to all three applicants as "the insurers," unless more detailed distinctions are appropriate.

ment against Dingwell's insurers. In return, Plaintiffs agreed to seek recovery against Dingwell solely out of the proceeds of Dingwell's insurance policies, and not from his personal assets.

Plaintiffs filed their Complaint against Dingwell on November 2, 1987, seeking contribution under section 107(a) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f)(1) (Count I); indemnification under common law principles (Count II); and breach of contract for failure to indemnify the Group for the costs incurred in the cleanup (Count III). Pursuant to the Settlement Agreement, Plaintiffs also filed the pending Motion for Entry of a Consent Judgment.[2]

Dingwell's insurers moved to intervene to oppose the entry of a consent judgment and to stay the action until numerous insurance coverage issues could be resolved in the pending *Travelers* action. Having heard oral arguments on the issues presented, the Court finds that the insurers are not entitled to intervene, and that Plaintiffs' motion for entry of the consent judgment should be granted.

## II. *Intervention*

The insurers claim that they are entitled to intervene under either Rule 24(a) or 24(b). The Court will address each contention in turn.

### A.

■ Before a party may intervene as a matter of right under Rule 24(a), it must meet four basic requirements: (1) the application must be timely; (2) the applicant must have an interest in the property or transaction which is the subject of the action; (3) the applicant must show that disposition of the action may as a practical matter impair or impede his ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties. *Moosehead Sanitary District v. S.G. Phillips Corp.,* 610 F.2d 49, 52 (1st Cir.1979). The McKin Group apparently concedes that the applications for intervention were made in a timely fashion.[3] The insurers filed the applications within two months of the initial filing, and thus did not cause a "last minute disruption of painstaking work by the parties and the court." *Culbreath v. Dukakis,* 630 F.2d 15, 22 (1st Cir.1980). Nor has the McKin Group claimed that the existing parties to the dispute are adequate representatives for the insurers' interests.[4] Therefore, the Court need only address the interest and impairment requirements. These two requirements are closely related, since "[t]he magnitude or extent of an intervenor's interest will be in part a function of how much 'the disposition of the action may as a practical matter impair or impede [the applicant's] ability to protect that interest....' Fed.R.Civ.P. 24(a)(2)." *Federal Deposit Ins. Corp. v. Jennings,* 816 F.2d 1488, 1492 (11th Cir.1987).

■ A party's interest must be "significantly protectable," *Donaldson v. United States,* 400 U.S. 517, 531, 91 S.Ct. 534, 542, 27 L.Ed.2d 580 (1971), and "direct, as opposed to remote or contingent." *Restor-A-Dent Dental Laboratories, Inc. v. Certified Alloy Products, Inc.,* 725 F.2d 871, 874 (2d Cir.1984). *Cf. Nuesse v. Camp,* 385 F.2d 694, 700 (D.C.Cir.1967) ("the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."). The insurers do not have a significantly protectable interest in the subject matter. By reserving the right to deny coverage and providing independent counsel, the insurers gave up the right to control the litigation between the Group and Dingwell, and

---

**2.** Plaintiffs state that the purpose of the consent judgment is to perfect their right to bring an action against Dingwell's insurers pursuant to the Maine reach and apply statute, 24-A M.R.S.A. § 2904.

**3.** In fact, the Group requested that the Court make no decision regarding the motion for consent judgment until after December 14, 1987, so

that the insurers would have a chance to be heard. That opportunity was provided at oral argument.

**4.** Dingwell has little, if any, incentive to protect his insurers' interests since the Settlement Agreement effectively insulates him from any further personal liability.

"thrust the responsibility for the litigation wholly upon the insured and [his] counsel." *Cay Divers, Inc. v. Raven*, 812 F.2d 866, 870 (3d Cir.1987). When the insurers reserved the right to deny coverage, Dingwell gained the ability to control those aspects of his case essential to the determination of his personal liability. *See Three Sons, Inc. v. Phoenix Ins. Co.*, 357 Mass. 271, 257 N.E.2d 774, 776–77 (1970). The insurers left Dingwell to proceed as best he could with his own defense, and the Agreement itself does not prejudice them or preclude them from asserting any available policy defense. *See Ideal Mutual Ins. Co. v. Myers*, 789 F.2d 1196, 1202–03 (5th Cir. 1986). The insurers cannot now intervene in this lawsuit and force Dingwell to litigate his liability.

 The insurers do not have a direct interest in the subject of this action, either. The subject of this action is the extent of Dingwell's obligation to indemnify or contribute to Plaintiffs for the costs of cleaning up the McKin site. As opposed to that discrete issue, the insurers' interest is to establish whether their policies cover Dingwell's obligations to the Group. However, the insurers' coverage defenses are not at issue in this litigation, and the insurers are not parties to the Settlement Agreement. Dingwell's alleged breach of the cooperation clause and other issues raised by the insurers are simply not germane to Plaintiffs' Complaint.[5]

The insurers' interest in the subject matter of the case also relies upon several contingencies: (1) the Court will grant the entry of consent judgment; (2) the Group will bring an action against the insurers under Maine's reach and apply statute; and (3) the state court will find that the insurers are responsible under the reach and apply statute for Dingwell's obligations to the Group.[6] The existence of these contingencies shows that the insurers' interests are not direct. *Restor–A–Dent*, 725 F.2d at 874.

 The insurers contend that their interests will be impaired or impeded by the entry of a consent judgment in their absence. The insurers point out that once it obtains the consent judgment, the Group plans to bring a reach and apply action against the insurers. 24–A M.R.S.A. § 2904. Maine's reach and apply statute provides that a judgment creditor may bring an action directly against an insurer to reach and apply the proceeds of the insurance policy to satisfy a judgment obtained against the insured. Since the Supreme Judicial Court has indicated that the defenses enumerated in the statute are exclusive,[7] *Michaud v. Mutual Fire, Marine*

5. Travelers argues that by entering into the Settlement Agreement, Dingwell breached the cooperation clause of the policy.

6. Compared to the insurers' lack of a direct interest in this action, the Group had a direct interest in the *Travelers* action. The pertinent issue in the *Travelers* action was whether the insurers were entitled to a declaration that they were not required to indemnify Dingwell with respect to any of Dingwell's obligations pursuant to the Settlement Agreement between Dingwell and the McKin Generator Group. The Group's interests were directly implicated in two important ways: first, the Group members were parties to the Settlement Agreement at issue; and second, the Settlement Agreement provided that the Group would seek relief from Dingwell only from the proceeds of his insurance policies. The insurers' interest is in determining whether the policies cover Dingwell's exposure for the cleanup costs. In contrast, the issue in this action is Dingwell's obligations to the McKin Generator Group, the EPA, and the DEP. Travelers' interests are therefore not implicated in the present case, since the issue of

coverage is distinct from the issue of Dingwell's liability.

Further, according to the insurers' own submissions, the Group's interests in the *Travelers* action were not contingent upon any other proceeding. The insurers in *Travelers* insisted that the Group would be precluded from recovering anything from the insurers (and thus Dingwell, too) if the Court declared that the insurers were not required to indemnify Dingwell. Here, the Court would not only have to enter the consent judgment, but two further steps will have to take place before the insurers could conceivably become obligated to pay the Group—namely, the Group must file a reach and apply action, and the court in that action must find that the Group can recover under Dingwell's policies.

7. The defenses enumerated in section 2904 are:
 1. *Motor vehicle operated illegally or by one under age.* When the insured automobile, motor vehicle or truck is being operated by any person contrary to law as to age or by any person under the age of 16 years where no statute restricts the age; or

& *Inland Ins. Co.*, 505 A.2d 786, 788–89 (Me.1986), the insurers argue that they will be effectively precluded from asserting their defense that Dingwell breached the insurance policy's cooperation clause if the Court grants the entry of judgment without allowing the insurers to intervene. The Court notes, however, that the defense of fraud or collusion is provided for under the reach and apply statute, and a cooperation clause is generally intended to prevent collusion between the insured and the injured person. The insurers could also raise their cooperation clause defenses in a declaratory judgment action in state court, where all of the necessary parties can participate. Thus, disposition of the action will not "as a practical matter impair or impede" the insurers' ability to preserve their defenses.

■ Even assuming that disposition of the case in the insurers' absence impaired or impeded the insurers' economic interests, they would not be entitled to intervene. The insurers' economic interest is not an interest in the "property or transaction which is the subject of this action. . . ." Fed.R.Civ.P. 24(a)(2). As the Fifth Circuit recently stated, "the consideration of practical harm [that may result from disposition of the main action] is irrelevant in the absence of some interest in the main action." *Mothersill D.I.S.C. v. Petroleos Mexicanos, S.A.*, 831 F.2d 59, 63 (5th Cir. 1987).

There are significant considerations of comity also weighing against granting intervention as of right. The insurers are seeking to block entry of a consent judgment in order to avoid having to litigate their insurance claims under Maine's reach and apply statute. The insurers seek to litigate in federal court what they allegedly would be precluded from litigating at the state level, while at the same time blocking all efforts to seek state adjudication. It is doubtful that Rule 24(a)(2) was intended to further the interests of forum shopping or to serve as a means to circumvent unfavorable state law. Were this Court to grant a right of intervention in this action based solely on the fact that the Maine reach and apply statute does not afford a certain coverage defense, the Court might undermine significantly the considered policy judgment of the Maine State Legislature. Of course, if the insurers are correct and their due process rights are violated because they cannot raise certain defenses under the reach and apply statute, the state courts are fully capable of addressing the issue. If the insurers are left unsatisfied by the Maine courts, they can seek full appellate review by the United States Supreme Court.

In conclusion, the insurers are not entitled to intervene as of right under Rule 24(a). An intervenor must meet all four requirements set out in the Rule. *International Tank Terminals, Ltd. v. M/V ACADIA FOREST*, 579 F.2d 964, 967 (5th Cir. 1978). The insurers have failed to fulfill two requirements: they do not have a direct interest in the subject of the action, and they have not shown that disposition of the action may impair or impede their interests.

### B.

■ The Court next addresses whether Travelers should be granted permissive intervention pursuant to Rule 24(b). The insurers seek permissive intervention under both 24(b)(1) and (2).[8] Even were the

---

2. *Motor vehicle used in race contest.* When such automobile, motor vehicle or trust [sic] is being used in any race or speed contest; or
3. *Motor vehicle used for towing a trailer.* When such automobile, motor vehicle or truck is being used for towing or propelling a trailer unless such privilege is indorsed on the policy or such trailer is also insured by the insurers; or
4. *Liability assumed.* In the case of any liability assumed by the insurers for others; or

5. *Liability under workmen's compensation.* In the case of any liability under any workmen's compensation agreement, plan or law; or
6. *Fraud or collusion.* When there is fraud or collusion between the judgment creditor and the insured.

8. Rule 24(b) provides in pertinent part:
 Upon timely application anyone may be permitted to intervene in an action: (1) when a

insurers to meet the requirements of either 24(b)(1) or (2), this Court still has broad discretion in determining whether to grant intervention. *See Restor–A–Dent*, 725 F.2d at 876.

■ In support of its request for permissive intervention pursuant to Rule 24(b)(1), Travelers relies on section 113(i) of CERCLA, 42 U.S.C. § 9613(i), which allows intervention only if the applicant can show that it has "an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest...." Section 113(i) sets forth the same conditions as are required for intervention as of right under Rule 24(a)(2). Without repeating the Rule 24(a)(2) analysis, the Court reaches the same conclusion as above with respect to intervention pursuant to section 113(i) of CERCLA.

■ Permissive intervention under Rule 24(b)(2) is allowable only when there are independent jurisdictional grounds for the applicant's proposed claims and defenses. *Moosehead Sanitary District*, 610 F.2d at 52 n. 5. Travelers concedes that complete diversity does not exist between it and the McKin Group. The Court must therefore address whether there are independent jurisdictional grounds for Travelers' crossclaims and counterclaims.

Travelers' cross-claims against Dingwell are simply allegations that its policies do not provide coverage for the Group's claims against Dingwell. Those crossclaims are thus grounded in state law. Travelers' first and second counterclaims also arise exclusively under state law.[9] Absent diversity jurisdiction, this Court lacks jurisdiction over these ancillary crossclaims and counterclaims that Travelers

seeks to assert in its intervention papers. *See United States v. Hooker Chemicals & Plastics Corp.*, 101 F.R.D. 451, 58 (W.D. N.Y.) (citing *Blake v. Pallan*, 554 F.2d 947, 956 (9th Cir.1977)), *aff'd*, 749 F.2d 968 (2d Cir.1984).

■ Travelers also seeks to assert counterclaims and affirmative defenses contesting the McKin Group's right to obtain contribution and indemnity from Dingwell. However, the insurers lack standing to raise these issues. *See Arvida Corp. v. City of Boca Raton*, 59 F.R.D. 316, 321 (S.D.Fla.1973) (applicant for intervention seeking to interpose a defense to pending litigation must also possess standing to assert that defense). Generally, for purposes of standing, a litigant must assert his own legal interest rather than that of a third party. *See generally Diamond v. Charles*, 476 U.S. 54, 62, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986). By reserving the right to deny coverage and providing independent counsel, Travelers voluntarily relinquished any standing to assert defenses on behalf of Dingwell in ongoing litigation between Dingwell and the McKin Group. Travelers is not a proper party to the adjudication of those issues.

■ Finally, Travelers argues that one of its claims invokes the jurisdiction of this Court pursuant to the Fifth and Fourteenth Amendments.[10] Specifically, Travelers claims that it has a federal due process right to be heard on certain defenses that it would allegedly be foreclosed from litigating under Maine's reach and apply statute. Travelers is, in effect, asserting a federal defense to an impending state court action. In such cases "it is the character of the threatened action, and not of the defense, which will determine whether there is fed-

---

statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

**9.** The first and second counterclaims allege that (1) the Settlement Agreement is unenforceable,

and (2) the McKin Group has tortiously interfered with contractual relations between Travelers and Dingwell.

**10.** Travelers cites 28 U.S.C. §§ 1331, 1343(3), 2201 and 2002, 42 U.S.C. §§ 1983, 1988 and 9613(b). Their proposed Answer omitted any counterclaim explicitly grounded in the Constitution, but Travelers asserts the omission was "inadvertent" and presented a proposed "Sixth Counterclaim" in its Reply Brief.

eral-question jurisdiction in the District Court." *Public Service Commission v. Wycoff Co.,* 344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952) (applying principle to declaratory judgment action). The threatened reach and apply action in this case arises under a Maine statute and does not involve a claim under federal law; accordingly, federal question jurisdiction should not attach.

Travelers and API therefore lack the independent jurisdictional grounds necessary for permissive intervention pursuant to Rule 24(b). Having already concluded that the insurers are not entitled to intervention as of right pursuant to Rule 24(a), the Court concludes that the motions to intervene must be denied.

### III. *The Consent Judgment*

As previously noted, the McKin Group has settled its contribution claims and common law indemnity claims against Dingwell. The Group now seeks a consent judgment ordering Dingwell to comply with the terms of the negotiated Settlement Agreement in order to perfect their right to bring an action against Dingwell's insurers pursuant to the Maine reach and apply statute, 24–A M.R.S.A. § 2904. The Court must first determine the appropriate standard of review to be given such a settlement agreement.

■ Normally, "so long as the dispute affects only private interests," a court has a limited role in determining whether to approve settlements calling for entry of a consent judgment. *Janus Films, Inc. v. Miller,* 801 F.2d 578, 582 (2d Cir.1986). It is this minimal standard of review that is urged upon the Court by Plaintiffs. There are certain special situations, however, where a trial court may be required to take a more active role in approving settlements. In proposed class action settlements, proposed shareholder derivative suit settlements, proposed compromises of bankruptcy claims, consent decrees in antitrust suits brought by the United States, or any suits affecting the public interest, a court must determine that the settlement is "fair, adequate, and reasonable." *Id.* Such increased scrutiny is necessary to protect the public interest, the interests of absent class members, or more generally, to guard against the danger "that any party is attempting to profit at the expense of unrepresented individuals." *United States v. City of Miami,* 614 F.2d 1322, 1332 n. 18 (5th Cir.1980).

■ On its face, the proposed settlement in the case at bar affects only private interests. However, because the Group intends to use the judgment against the insurers in a subsequent reach and apply action, there is the risk that the parties to the Agreement are attempting to profit at the expense of the insurers, who are unrepresented in this action. The Court will therefore scrutinize the Agreement closely in order to determine whether it is "fair, adequate, and reasonable."

Dingwell is subject to strict liability under section 107(a)(2) of CERCLA for all cleanup costs and other damages incurred by the United States, the State of Maine, and all private parties injured by the environmental contamination. 42 U.S.C. § 9607(a)(2). Group members are also strictly liable, as they contracted with Dingwell for the disposal of their waste materials or transported the waste. 42 U.S.C. § 9607(a)(3) and (4). Having paid for the cleanup and settled government claims for response costs and natural resource damages, the Group may seek contribution from Dingwell. 42 U.S.C. § 9613(f)(1); *see also United States v. Conservation Chemical Co.,* 628 F.Supp. 391, 404 (W.D.Mo.1985) (section 107(a) provides a private right of action for contribution). The Court finds, therefore, that there exists both a legal and a factual basis for the Group's contribution claims under CERCLA.[11]

11. Having determined that the Group has legally cognizable claims grounded in fact for contribution under CERCLA, the Court need not address the Group's common law and contractual indemnity claims.

■ The Court initially approaches the question of the Agreement's fairness, adequacy, and reasonableness with some skepticism. After all, Dingwell agreed to assume the majority of the cleanup costs for a promise that his liability would be limited to the proceeds from his insurance policies. Upon careful study of the proposed Agreement, however, the Court is convinced that the Agreement is fair, adequate, and reasonable.

In determining a fair apportionment of damages under CERCLA, a court should consider several factors:

(1) the ability of the parties to demonstrate that their contribution to a discharge release or disposal of a hazardous waste can be distinguished;

(2) the amount of the hazardous waste involved;

(3) the degree of toxicity of the hazardous waste involved;

(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

*United States v. A & F Materials Co., Inc.*, 578 F.Supp. 1249, 1256 (S.D.Ill.1984). *See also* H.R.Rep. No. 253, 99th Cong., 1st Session 19 (1985), *reprinted in* 1986 U.S. Code Cong. & Admin.News at 2835, 3042.

In a dispute between waste generators and the site operator, the last three factors articulated in *A & F Materials* are most important for the Court's consideration. In the present case, the degree of involvement by the parties are equally proportionate: Group members were fully involved in the generation and transportation of the waste, while Dingwell was fully involved in the treatment, storage, and disposal of the waste.

The second relevant factor, the degree of care exercised by the parties, weighs heavily in favor of the Group. Group members hired Dingwell to clean storage tanks on their premises and to dispose of the waste materials. They are responsible for the cleanup only because of their contractual relationship with Dingwell. The environmental damages were caused by Dingwell's failure to contain or dispose of the wastes properly.[12] Accordingly, Dingwell should bear a greater portion of the cleanup costs.

The third relevant factor also weighs heavily in favor of the Group. Members of the Group cooperated with the EPA and DEP, put up millions of dollars to finance the initial phase of the remedial action, and negotiated a Consent Decree with the governmental agencies. In contrast, Dingwell has not cooperated actively in the cleanup effort. Thus, under the *A & F Materials* criteria, Dingwell should bear a greater portion of the cleanup costs.

In light of the strong public policy in favor of settling disputes, Dingwell's comparative lack of care with respect to the hazardous waste, and Dingwell's comparative lack of cooperation with governmental agencies to prevent harm to the public health or the environment, the Court finds that the Agreement is reasonable, adequate and fair. Dingwell was exposed to one

---

12. Travelers has claimed that Dingwell "engaged in the intentional, knowing, reckless and/or negligent mishandling of hazardous substances at the McKin site," and that "Dingwell had knowledge of the damages caused by the McKin Company's handling, storage and disposal of hazardous substances on the McKin site and knew that such events would result in injury and purported property damage during the policy periods." *Travelers v. Dingwell*, Civ. No. 87–288–P (D.Me.), Complaint ¶¶ 15, 32. Travelers even goes so far as to charge that "Dingwell expected or intended the leakage, emission, discharge, seepage, release and escape of hazardous substances onto the ground at the McKin site...." *Id.* at ¶ 17. Assuming that Travelers' counsel made a "reasonable inquiry" that the Complaint is "well grounded in fact," as required by Fed.R.Civ.P. 11, Travelers cannot now object to a finding that Dingwell is sixty-five percent liable. If, as Travelers alleges, Dingwell intentionally contaminated the site, his liability could be considerably more than sixty-five percent.

hundred percent liability, and rationally decided to compromise. Further, the sixty-five percent figure is below the allocation established in the only adjudicated case brought to the attention of this Court concerning the proper apportionment of cleanup liabilities between an owner-operator of a site and waste generators. *Advance Circuits, Inc. v. Carriere Properties*, No. 84–3316 (Minn.D.Ct., Hennepin County, Feb. 18, 1987) (owner-operator was liable for seventy percent of cleanup costs), *aff'd*, No. C8–87–1436 (Minn.Ct.App., Feb. 9, 1988) (unpublished) [available on WEST-LAW, 1988 WL 10476].

Having determined that entry of a consent judgment is both lawful and consistent with public policy, the Court shall act accordingly. In so doing, the Court makes no determination on the merits of the Travelers' claims against Dingwell, nor does it determine whether the terms of the Settlement Agreement should be binding on third parties not joined herein.

### IV. *Order*

For the reasons set forth herein, the Court hereby rules that:

(1) The Motions to Intervene by Travelers, API, and Chicago Insurance Company are DENIED.

(2) Plaintiff's Motion for Entry of Consent Judgment is GRANTED.

So ORDERED.

### ORDER

WHEREAS, Plaintiffs have filed a Complaint seeking indemnity and/or contribution from Defendant, pursuant to 42 U.S.C. § 9313(f)(1) and the common law, for the cost of cleaning up environmental damage at a waste site near McKin, Maine that was owned and operated by Defendant;

WHEREAS, Plaintiffs and Defendant have entered into a Settlement Agreement dated September 24, 1987, as amended;

WHEREAS, Defendant has consented to entry of a Consent Judgment ordering him to comply with the terms of the Settlement Agreement;

WHEREAS, notice of the Complaint and the Motion for a Consent Judgment has been given to Defendant, Defendant's insurers, the United States, and the State of Maine;

NOW THEREFORE, the Court enters judgment on the Complaint in favor of Plaintiffs and orders Defendant to comply with the Settlement Agreement dated September 24, 1987, as amended to the date hereof.