932 F.2d 568
 33 ERC 1041, 60 USLW 2059, 21 Envtl.
L. Rep. 21,062
 UNITED STATES of America, Plaintiff,
v.
R.W. MEYER, INC., Defendant/Third Party, Plaintiff-Appellant,
Northernaire Plating Company, Willard S. Garwood,
Defendants/Third Party, Plaintiffs-Appellees,
City of Cadillac, Third Party Defendant, Fourth Party Plaintiff.
 No. 89-2236.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 5, 1990.
Decided May 9, 1991.
 
 1
 Susan J. Bradley (argued), Jon D. VanderPloeg, Smith, Haughey, Rice & Roegge, Grand Rapids, Mich., for defendant-appellant R.W. Meyer, Inc.
 
 
 2
 Michael P. McCasey, Miles J. Murphy (argued), Cholette, Perkins & Buchanan, Grand Rapids, Mich., Susan E. Morrison, Gary R. Rentrop, P.C., Bloomfield Hills, Mich., for defendants-appellees Willard S. Garwood and Northernaire Plating Co.
 
 
 3
 Before GUY and BOGGS, Circuit Judges, and BERTELSMAN, District Judge.*
 
 
 4
 BERTELSMAN, District Judge.
 
 
 5
 This appeal involved the construction of the provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) governing contribution actions among responsible parties following a cleanup of a hazardous waste site and an Immediate Removal Action by the Environmental Protection Agency (EPA). 42 U.S.C. Secs. 9607, 9613(f)(1).
 
 BACKGROUND
 
 6
 The facts and background necessary to place this opinion in context were well stated by Chief Judge Hillman in his unpublished opinion awarding contribution, as follows:
 
 
 7
 "This matter stems from a suit brought by the United States against Northernaire Plating Company ("Northernaire") for recovery of its costs in conducting an 'Immediate Removal Action' pursuant to the Comprehensive Environmental Response, Compensation & Liability Act (hereinafter, "CERCLA"), 42 U.S.C. Sec. 9601, et seq. Northernaire owned and operated a metal electroplating business in Cadillac, Michigan. Beginning in 1972, it operated under a 10-year lease on property owned by R.W. Meyer, Inc. ("Meyer"). Northernaire continued operations until mid-1981 when its assets were sold to Toplocker Enterprises, Inc. ("Toplocker"). From July of 1975 until this sale, Willard S. Garwood was the president and sole shareholder of Northernaire. He personally oversaw and managed the day-to-day operations of the company.
 
 
 8
 "Acting upon inspection reports from the Michigan Department of Natural Resources ("MDNR"), the United States Environmental Protection Agency ("EPA") conducted an Immediate Removal Action at the Northernaire site from July 5 until August 3, 1983. Cleanup of the site required neutralization of caustic acids, bulking and shipment of liquid acids, neutralization of caustic and acid sludges, excavation and removal of a contaminated sewer line, and decontamination of the inside of the building. All of the hazardous substances found at the site were chemicals and by-products of metal electro-plating operations.
 
 
 9
 "In an earlier opinion and order dated May 6, 1988, this court found the defendants Garwood, Northernaire, and Meyer jointly and severally liable to plaintiff for the costs of the Immediate Removal Action under Section 107(a) of CERCLA. 42 U.S.C. Sec. 9607(a). United States v. Northernaire Plating Co., 670 F.Supp. 742 (W.D.Mich.1987). The court awarded plaintiff $268,818.25 plus prejudgment interest. The court later determined the prejudgment interest due to be $74,004.97, making the total award to plaintiff $342,823.22.
 
 
 10
 "Each defendant, (Northernaire and Garwood moving together) has brought cross-claims for contribution against the other. Currently before the court are the summary judgment motions on these cross-claims.
 
 
 11
 "CERCLA specifically allows actions for contribution among parties who have been held jointly and severally liable:
 
 
 12
 "(1) Contribution
 
 
 13
 "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this sub-section shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or section 9607 of this title.
 
 
 14
 "42 U.S.C. 9613(f)(1)."
 
 
 15
 Joint App., at 414-16.
 
 
 16
 Further details may be found in the opinions of the trial court and this court which imposed joint and several liability on the instant parties.[1] United States v. Northernaire Plating Company, 670 F.Supp. 742 (W.D.Mich.1987); aff'd sub nom., United States v. R.W. Meyer, Inc., 889 F.2d 1497 (6th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).
 
 
 17
 Apparently, the parties allowed the building to degenerate into a true environmental disaster area. As this court observed in the former appeal:
 
 
 18
 "In March 1983, officials from the EPA and the Michigan Department of Natural Resources (MDNR) examined the property. Their examination was prompted by earlier reports of MDNR officials indicating that the building had been locked and abandoned and that a child had received chemical burns from playing around discarded drums of electroplating waste that were left outside the building. State tests on samples of the soil, sludge, and drum contents disclosed the presence of significant amounts of caustic and corrosive materials. During their examination of the site, EPA and MDNR officials observed drums and tanks housing cyanide littered among disarray outside the facility. Based on their observations outside the building, the officials determined that Northernaire had discharged its electroplating waste into a "catch" basin and that the waste had seeped into the ground from the bottom of the basin. The waste then entered a pipe that drained into a sewer line that discharged into the sewage treatment plant for the city of Cadillac."
 
 
 19
 Meyer, 889 F.2d at 1498-99 (footnote omitted).
 
 
 20
 In the former appeal, this court affirmed the decision of the trial court finding that the damage to the site had been "indivisible" and imposing joint and several liability on the present parties to reimburse the EPA for the removal costs for the cleanup of the building.[2]
 
 
 21
 The total cost of the cleanup plus prejudgment interest was $342,823.22. In this subsequent contribution action, the trial court held that two-thirds of the liability should be borne by Northernaire and its principal shareholder, each contributing one-third each. But the court held that the remaining one-third ($114,274.41) should be borne by the appellant property owner.
 
 
 22
 The appellant attacks this apportionment, arguing strenuously that its responsibility should be limited to an amount apportioned according to the degree that the sewer line mentioned in the above quote contributed to the cleanup costs. Applying this approach, the appellant generously offers to pay $1,709.03. Appellees accept the trial court's apportionment.
 
 
 23
 The appellant also quibbles about certain statements made by the trial court in its opinion, stating that some facts recited were not supported by the record.
 
 ANALYSIS
 
 24
 The trial court held that it was within its discretion to apply certain factors found in the legislative history of CERCLA in making its contribution apportionment. Although these factors were originally intended as criteria for deciding whether a party could establish a right to an apportionment of several liability in the EPA's initial removal action, the trial court found "these criteria useful in determining the proportionate share each party is entitled to in contribution from the other." Joint App., at 417.
 
 The criteria mentioned are:
 
 25
 "(1) the ability of the parties to demonstrate that their contribution to a discharge release or disposal of a hazardous waste can be distinguished;
 
 
 26
 "(2) the amount of the hazardous waste involved;
 
 
 27
 "(3) the degree of toxicity of the hazardous waste involved;
 
 
 28
 "(4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
 
 
 29
 "(5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
 
 
 30
 "(6) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment."
 
 
 31
 Id. (citing Amoco Oil Co. v. Dingwell, 690 F.Supp. 78, 86 (D.Me.1988), aff'd sub nom. Travelers Indemnity Co. v. Dingwell, 884 F.2d 629 (1st Cir.1989); United States v. A & F Materials Co., Inc., 578 F.Supp. 1249 (S.D.Ill.1984); H.R. No. 253(III), 99th Cong., 2d Sess. 19, (1985), reprinted in 1986 U.S.Code Cong. & Admin.News 2835, 3038, 3042).
 
 
 32
 The trial court recognized that the lessee was the primary actor in allowing this site to become contaminated. (Appellant argues that the lessee was the only actor.) The trial court found, however, that in addition to constructing the defective sewer line which contributed to the contamination, appellant bore significant responsibility "simply by virtue of being the landowner." Id. at 418. The trial court observed further that appellant "neither assisted nor cooperated with the EPA officials during their investigation and eventual cleanup of the ... site." Id.
 
 
 33
 Chief Judge Hillman concluded, "As it is well within the province of this court, I have balanced each of the defendants' behavior with respect to the equitable guidelines discussed." Id. at 421. As a result of the balancing, he made the apportionment described above.
 
 
 34
 The trial judge was well within the broad discretion afforded by the statute in making the apportionment he did.
 
 
 35
 Congress intended to invest the district courts with this discretion in making CERCLA contribution allocations when it provided, "the court may allocate response costs among the liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. Sec. 9613(f)(1) (emphasis added).
 
 
 36
 Essentially, appellant argues here that a narrow, technical construction must be given to the term "contribution," so that, as in common law contribution, contribution under the statute is limited to the percentage a party's improper conduct causally contributed to the toxicity of the site in a physical sense. This argument is without merit. On the contrary, by using the term "equitable factors" Congress intended to invoke the tradition of equity under which the court must construct a flexible decree balancing all the equities in the light of the totality of the circumstances.[3]
 
 
 37
 "It is well established that flexibility is proper in the successful shaping ... of an equitable decree. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554, reh'g denied 403 U.S. 912, 91 S.Ct. 2200, 29 L.Ed.2d 689 (1971); United States v. City of Parma, 661 F.2d 562, 563, 576 (6th Cir.1981)."[4]
 
 
 38
 In a highly persuasive decision, Charles v. Charles, 788 F.2d 960, 965 (3d Cir.1986), the court held that a Virgin Islands statute directing courts to consider the "equity of the case" in allocating marital property required the trial court to consider marital fault. The court observed that the statute authorized the trial court to "use a variety of means to obtain an equitable result." Id. at 966.
 
 
 39
 Noting the accepted definition of "equitable," the court observed:
 
 
 40
 "In this regard, Black's Law Dictionary, 482 (5th ed. 1979) defines 'equitable' as '[j]ust; conformable to principles of justice and right. Existing in equity; available or sustainable in equity, or upon the rules and principles of equity. 'Equity' is defined as '[j]ustice administered according to fairness as contrasted with the strictly formulated rules of common law.' Id. at 484."
 
 
 41
 Id. at 965, n. 13.
 
 
 42
 "The hallmark of a court of equity is its ability to frame its decree to effect a balancing of all the equities and to protect the interest of all affected by it, including the public."[5] Congress reemphasized that the trial court should invoke its moral as well as its legal sense by providing that the court use not just "equitable factors," which phrase already implies a large degree of discretion, but "such equitable factors as the court determines are appropriate." This language broadens the trial court's scope of discretion even further.
 
 
 43
 Thus, under Sec. 9613(f)(1) the court may consider any factor it deems in the interest of justice in allocating contribution recovery. Certainly, the several factors listed by the trial court are appropriate, but as it recognized, it was not limited to them. No exhaustive list of criteria need or should be formulated. However, in addition to the criteria listed above, the court may consider the state of mind of the parties, their economic status, any contracts between them bearing on the subject, any traditional equitable defenses as mitigating factors[6] and any other factors deemed appropriate to balance the equities in the totality of the circumstances.
 
 
 44
 Therefore, the trial court quite properly considered here not only the appellant's contribution to the toxic slough described above in a technical causative sense, but also its moral contribution as the owner of the site. Review of the trial court's equitable balancing process is limited to a review for "abuse of discretion."[7] This is in accord with the principle of equity that the chancellor has broad discretion to frame a decree.[8]
 
 
 45
 This case, even though it involves over $300,000, is but a pimple on the elephantine carcass of the CERCLA litigation now making its way through the court system. Some of these cases involve millions or even billions of dollars in cleanup costs and hundreds or even thousands of potentially responsible parties.
 
 
 46
 I do not believe Congress intended to require meticulous findings of the precise causative contribution each of several hundred parties made to a hazardous site. In many cases, this would be literally impossible.[9] Rather, by the expansive language used in Sec. 9613(f)(1) Congress intended the court to deal with these situations by creative means, considering all the equities and balancing them in the interests of justice. As recognized by a recent comprehensive scholarly article, this multi-factor approach takes into account more varying circumstances than common law contribution.[10]
 
 
 47
 "Courts are also following CERCLA Section 113(f) and taking 'equitable factors' into account in apportioning liability for response costs. The equitable factors which courts are examining in order to decide what kind of apportionment to make depend on the actual facts of each case. Nevertheless, many federal courts do consider common law equitable defenses such as unclean hands and caveat emptor as mitigating factors in deciding liability for response costs. This approach is in line with Congressional intent as long as courts do not consider these equitable defenses to be a total bar to a liability action, but merely mitigating factors in awarding damages. Courts are also using a modified comparative fault analysis that takes numerous factors such as culpability and cooperation into account in apportioning damages."[11]
 
 
 48
 Although such an approach "cannot be applied with mathematical precision, it is the fairest and most workable approach for apportioning CERCLA liability.[12] Such an approach furthers the legislative intent of encouraging the prompt cleanup of hazardous sites by those equitably responsible.[13] The parties actually performing the cleanup can look for reimbursement from other potentially responsible parties without fear that their contribution actions will be bogged down by the impossibility of making meticulous factual determinations as to the causal contribution of each party. Chief Judge Hillman was well within the equitable discretion afforded him by Congress in the way he handled this CERCLA contribution action.
 
 
 49
 AFFIRMED.
 
 
 50
 RALPH B. GUY, Jr., Circuit Judge, concurring.
 
 
 51
 Although I concur in the result reached by Judge Bertelsman, I write separately because this area of the law is both new and complex. In many, if not most, of these cases arising under CERCLA, multi-party liability will be involved. Unfortunately, for the parties as well as the courts, the sorting out of responsibility is not an easy task. I view this particular case as a close one, and want to set forth in more detail my reasons for concurrence.
 
 I.
 
 52
 Appellate review of a district court's findings of fact is controlled by the "clearly erroneous" rule. Fed.R.Civ.P. 52(a). Consequently, a district court's findings of fact shall not be set aside unless clearly erroneous, and that occurs "when[,] although there is evidence to support [the finding], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Loudermill v. Cleveland Bd. of Educ., 844 F.2d 304, 308 (6th Cir.), cert. denied, 488 U.S. 941, 109 S.Ct. 363, 102 L.Ed.2d 353 (1988) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). It is pursuant to this standard that we review Meyer's claim that the court's decision allocating clean-up costs relied on findings of fact not supported by the record. The main thrust of this argument is that there was insufficient evidence to support a finding of causation between Meyer's negligent activity and the condition ultimately requiring the EPA response. "A district court's ultimate and subsidiary findings concerning causation, negligence, nuisance, trespass, actual damages, and punitive damages, are all factual determinations included within the scope of Rule 52(a)." Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1198 (6th Cir.1988) (footnotes omitted). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, this court may not reverse the trial court even though we would have weighed the evidence differently had we been sitting as the trier of fact. Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).
 
 
 53
 A different standard is employed, however, when reviewing Meyer's claim that the trial court erred when it included Meyer's status as a landowner among the relevant equitable considerations. In Loudermill, we looked to the language of the governing statute to determine the standard for reviewing the lower court's award of attorney fees, and determined that an abuse of discretion standard was required. 844 F.2d at 308-09. Here, the governing statute provides that, "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. Sec. 9613(f)(1) (emphasis added). The clear language of the statute states that the court will be free to allocate responsibility according to any combination of equitable factors it deems appropriate. See O'Neil v. Picillo, 883 F.2d 176, 183 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990). Consequently, it is within the trial court's discretion to determine what considerations are relevant to apportioning costs, and only when the court clearly abuses that discretion can we reverse that determination. Similarly, and for reasons set forth below, Meyer's claim that the court improperly balanced the equitable factors, thereby unfairly apportioning CERCLA costs, must be reviewed under an abuse of discretion standard.
 
 II.
 A.
 
 54
 Meyer first contends that the court erroneously attributed the buildup of hazardous waste on the premises to a defective sewer line constructed by Meyer to carry discharge from the electroplating plant to a sewer line belonging to the City of Cadillac. Meyer acknowledges that it constructed the sewer line in question and concedes responsibility for excavation and decontamination of the line, but asserts that the record does not support the finding that defects in the sewer line were the cause of Northernaire's inability to dispose safely of the toxic substances. Instead, the buildup of waste on the premises that led to the subsequent EPA response and a substantial portion of the response costs, according to Meyer, can be attributed to the city's revocation of Northernaire's permit to discharge waste into the city's sewage system. Contending that the city revoked the permit because Northernaire exceeded the permitted levels of waste discharge, and not because the sewer line constructed by Meyer leaked, Meyer argues that the court erred in finding that construction defects in the sewer line contributed to Northernaire's inability to remove hazardous waste from the building.
 
 
 55
 While one of the district court's findings was in error, we do not believe that this mistake makes its apportionment of the amount due clearly erroneous. The district court found that Meyer's failure to construct and maintain an adequate sewer line contributed to Northernaire's failure to properly dispose of the waste. This finding is in error because Northernaire's failure to dispose of the waste was directly tied to the revocation of its permit for disposal into the city's sewers, and Meyer's faulty sewer had nothing to do with this revocation. The sewer permit was revoked because the concentration of toxic wastes was too high, and the sewer merely carried the already highly concentrated wastes from Northernaire's building to the city's sewers. While the city did state that "[p]ermanent reduction through sound management practices incorporating well-designed and constructed pre-treatment facilities is the only solution[,]" sewer lines are not part of pre-treatment facilities. Sewers only carry the waste water that has already passed through pre-treatment facilities. As Meyer had no contractual responsibility in the construction of the building for the provision of pre-treatment facilities, providing only the plumbing, sewers, and concrete slab under the building, Meyer had no contractual responsibility for the revocation of the sewer permit.
 
 
 56
 This finding, however, does not require us to hold that the district court's apportionment of costs was clearly erroneous. CERCLA gives wide discretion to the district court in establishing levels of contribution and permits the evaluation of other factors besides direct causation. Meyer's involvement with Northernaire extended well beyond the failure to provide an adequate waste water disposal system. Meyer disputes this, and specifically assails the trial court finding that Meyer was instrumental in the negotiations which brought Northernaire to Cadillac. Yet, Robert Meyer's own deposition supports the finding that Meyer was interested in developing its property for industrial use; that Meyer pursued this interest by entering lease negotiations with Northernaire officials, which subsequently led to the collection of rent; that Meyer contracted with Northernaire to build its facility; and that Meyer arranged construction of the building which housed Northernaire, fully aware of the nature of the manufacturing to be conducted on the site. Therefore, Meyer's contention that the trial court erroneously based its decision on findings of fact not supported by the record must be rejected.
 
 B.
 
 57
 Before Congress confirmed the right to contribution by amending CERCLA in 1986, 42 U.S.C. Sec. 9613(f)(1), courts looked to the 1980 legislative history of CERCLA to sustain a defendant's right to contribution and to determine criteria for apportioning contribution. Colorado v. ASARCO, Inc., 608 F.Supp. 1484, 1489 (D.Colo.1985); United States v. A & F Materials Co., 578 F.Supp. 1249, 1256 (S.D.Ill.1984). Although Congress clarified the right to contribution in 1986, it provided no further guidance as to the considerations for apportioning contribution, other than to say that the court may use "such equitable factors as the court determines are appropriate." 42 U.S.C. Sec. 9613(f)(1). Consequently, the lower court in this case, as other courts have done, looked to the 1980 Senate and House bills for guidance in determining the proportionate share each party is entitled to in contribution from the other. Amoco Oil Co. v. Dingwell, 690 F.Supp. 78, 86 (D.Me.1988), aff'd sub nom. Travelers Indem. Co. v. Dingwell, 884 F.2d 629 (1st Cir.1989). The pertinent language of the House bill states:[1]
 
 
 58
 In apportioning liability under this subparagraph, the court may consider among other factors, the following:
 
 
 59
 (i) the ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished;
 
 
 60
 (ii) the amount of the hazardous waste involved;
 
 
 61
 (iii) the degree of toxicity of the hazardous waste involved;
 
 
 62
 (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
 
 
 63
 (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
 
 
 64
 (vi) the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.
 
 
 65
 126 Cong.Rec. 26,779, 26,781 (1980) (emphasis added). See also H.R.Rep. No. 253 (III), 99th Cong., 1st Sess. 19 (1985), reprinted in 1986 U.S.CODE CONG. & ADMIN.NEWS 2835, 3042.
 
 
 66
 Although Meyer acknowledges that section 107(a) of CERCLA, 42 U.S.C. Sec. 9607(a), provides that landowners shall be liable for the costs of removal actions, Meyer argues that the court erred by including its status as a landowner among the factors for determining the allocation of costs among liable parties. Implicit in Meyer's argument is the contention that it is improper for the court to go beyond a consideration of the apportionment criteria enumerated in the House bill. Meyer's claim of error is not persuasive.
 
 
 67
 First, as indicated by the emphasis provided in the quoted legislative provisions, the language of the original bills simply provided that the court could apportion damages according to the listed criteria. Second, because the apportionment criteria were not retained in CERCLA as finally enacted, they are not mandated by Congress.[2] Although there is authority for the proposition that Congress implicitly retained the essence of the Gore Factors and intended to reject only mandatory legislative standards, A & F Materials, 578 F.Supp. at 1256-57, the deletion of the criteria also supports the proposition that Congress intended the court to have flexibility in determining apportionment. See ASARCO, 608 F.Supp. at 1489. Finally, Congress's clear expression in the 1986 amendments to CERCLA that the court may use "such equitable factors as the court determines are appropriate," 42 U.S.C. Sec. 9613(f)(1), confirms the legislative intent to grant courts flexibility in exercising their discretion. See also H.R.Rep. No. 253(I), 99th Cong., 1st Sess. 1, 80 (1985), reprinted in 1986 U.S.CODE CONG. & ADMIN.NEWS 2835, 2862 ("courts are to resolve such claims on a case-by-case basis, taking into account relevant equitable considerations"). Consequently, the criteria are neither mandatory nor necessarily exclusive of other considerations when apportioning damages among contributing tortfeasors under CERCLA.
 
 
 68
 Insofar as the court considered Meyer's landowner status as bearing on its relative contribution to the events necessitating the removal action, such consideration does not represent an abuse of discretion when the court viewed the landowner status in combination with other relevant factors. The district court's decision was not guided solely by Meyer's landowner status but, rather, by the actions he took or failed to take as the landowner. Landowner status provided Meyer with the opportunity to solicit Northernaire to conduct business on the site--business which involved the use of highly corrosive and caustic substances. Knowing the business to be conducted on its property, Meyer then built and leased to Northernaire a sewer line inadequately designed and constructed for the disposal of the waste generated by Northernaire's electroplating operations. Meyer's status as landowner, when viewed in combination with actions taken by Meyer that determined the manner in which its property would be used, is a permissible consideration in determining Meyer's degree of involvement in the events precipitating the removal action.
 
 C.
 
 69
 Meyer next argues that the court unfairly apportioned the liability under CERCLA through an improper balancing of the equitable factors in this action.
 
 
 70
 CERCLA is silent as to the methodology to be applied when apportioning costs among liable parties. However, if anything can be gleaned from a reading of the legislative history, particularly the six criteria utilized by the trial court, it is that Congress sought to impose upon the judiciary an obligation to apportion responsibility in a fair and equitable manner. As long as the trial court does not arbitrarily or unreasonably ignore the comparative fault of the parties, where there is a reasonable basis for allowing that comparison to be made, its determination will not be set aside. See United States v. Conservation Chem. Co., 628 F.Supp. 391, 401-02 (W.D.Mo.1985).
 
 
 71
 This reading of CERCLA is consistent with previous holdings that, where joint and several liability is imposed, courts must consider traditional and evolving principles of federal common law. United States v. Monsanto Co., 858 F.2d. 160, 171 (4th Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989); United States v. Chem-Dyne, 572 F.Supp. 802, 808-10 (S.D.Ohio 1983). In Monsanto, the Fourth Circuit held that the principles reflected in the RESTATEMENT (SECOND) OF TORTS represented the correct and uniform rules applicable to CERCLA cases. 858 F.2d at 172. The proper standard for contribution is that contained in section 886A of the Restatement. ASARCO, 608 F.Supp. at 1490; Sand Springs Home v. Interplastic Corp., 670 F.Supp. 913, 917 (N.D.Okla.1987). Section 886A reads as follows:
 
 
 72
 (1) Except as stated in Subsections (2), (3) and (4), when two or more persons become liable in tort to the same person for the same harm, there is a right of contribution among them, even though judgment has not been recovered against all or any of them.
 
 
 73
 (2) The right of contribution exists only in favor of a tortfeasor who has discharged the entire claim for the harm by paying more than his equitable share of the common liability, and is limited to the amount paid by him in excess of his share. No tortfeasor can be required to make contribution beyond his own equitable share of the liability.
 
 
 74
 (3) There is no right of contribution in favor of any tortfeasor who has intentionally caused the harm.
 
 
 75
 (4) When one tortfeasor has a right of indemnity against another, neither of them has a right of contribution against the other.
 
 
 76
 RESTATEMENT (SECOND) OF TORTS Sec. 886A (1982) (emphasis added).
 
 
 77
 The pertinent inquiry under the Restatement is whether the court required Meyer to make contribution beyond its own equitable share of the liability. If the contribution ordered by the court arguably reflects the relative fault of each of the parties, as established by a fair reading of the facts, then the contribution Meyer appeals is not beyond his own equitable share. See RESTATEMENT (SECOND) OF TORTS Sec. 886A, comment h. See also Monsanto, 858 F.2d. at 173 n. 29 ("the language of CERCLA's new contribution provisions reveals Congress' concern that the relative culpability of each responsible party be considered in determining the proportionate share of costs each must bear").
 
 
 78
 Because the relative fault of parties to a contribution action will depend upon the factual circumstances, Meyer's claim must be reviewed by examining whether the equitable considerations employed by the trial court, when applied to the facts of this case, support the conclusion that the court properly exercised its discretion.
 
 
 79
 The court established that Meyer was instrumental in efforts to bring Northernaire to Cadillac, was fully aware of the nature of the manufacturing to be conducted on the site, built the building that housed the facility, and failed to construct or maintain an adequate sewer line. Applying these facts to the first criterion listed among the Gore Factors, the court could fairly determine that Meyer had not demonstrated that its contribution to the events precipitating the government's cleanup were limited to the defective sewer line. Furthermore, the same facts applied to the fifth criterion support the conclusion that Meyer failed to exercise care with respect to the hazardous waste that was produced on its property.
 
 
 80
 It cannot be said that the court unfairly overlooked the responsibility of Northernaire and Garwood in apportioning relative liability in this contribution action. On the contrary, the court concluded that Northernaire and Garwood were the primary actors involved in the generation, transportation, treatment, storage, and disposal of the effluents. In addition, the court determined that Northernaire and Garwood bore heavy responsibility for knowingly and carelessly leaving substantial amounts of contaminated wastes in the facility. For these reasons, the court placed the majority of the costs of the immediate removal action upon Northernaire and Garwood. Consequently, placing one-third responsibility on Meyer does not represent such an unfair and inequitable allocation of fault as to constitute an abuse of discretion.
 
 
 81
 Meyer argues, finally, that although none of the parties participated in the EPA investigation or clean-up, the court weighed Meyer's lack of cooperation against it, while ignoring that Northernaire and Garwood also did not cooperate. This contention lacks merit. The court's opinion clearly discusses and considers the "wholly uncooperative" behavior of Northernaire and Garwood throughout the investigation, and concludes that this behavior indicates a total disregard for their responsibilities.
 
 
 82
 Contribution actions among parties held jointly and severally liable under CERCLA often involve complex factual scenarios associated with multi-party liability and necessarily require courts to perform a case-by-case evaluation when allocating the cost for clean-up of hazardous waste. Under the facts of this case, it cannot be said that the court improperly balanced the equitable factors relevant to resolving contribution claims under CERCLA.
 
 
 
 *
 William O. Bertelsman, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 The statutory scheme of CERCLA is well described in Barr, CERCLA Made Simple: An Analysis of the Cases Under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 45 Bus.Law. 923 (1990); See also, Developments in the Law--Toxic Waste Litigation, 99 Harv.L.Rev. 1458 (1986) (published before 1986 amendments)
 
 
 [2]
 Joint and several liability may be imposed on a responsible party, even though its role in creating the hazardous site was small, if the harm is indivisible. It may then seek contribution from other potential responsible parties in an action such as the instant case. See e.g., The Anspec Co., Inc. v. Johnson Controls, Inc., 922 F.2d 1240 (6th Cir.1991); United States v. Western Processing Co., Inc., 734 F.Supp. 930, 942 (W.D.Wash.1990); CERCLA Made Simple, supra, at 977-79, 990-93
 
 
 [3]
 The pertinent legislative history reads: "New subsection 113(g)(1) of CERCLA was also amended by the Committee to ratify current judicial decisions that the courts may use their equitable powers to apportion the costs of clean-up among the various responsible parties involved with the site. The Committee emphasizes that courts are to resolve claims for apportionment on a case-by-case basis pursuant to Federal common law, taking relevant equitable considerations into account. Thus, after all questions of liability and remedy have been resolved, courts may consider any criteria relevant to determining whether there should be an apportionment." H.R. 253(III), 99th Cong., 2d Sess. 19, (1985), reprinted in 1986 U.S.Code Cong. & Admin.News 2835, 3038, 3041-42
 
 
 [4]
 United States v. City of Birmingham, Mich., 727 F.2d 560, 566 (6th Cir.1984); accord S. Childress & M. Davis, Standards of Review Sec. 4.16 (1986)
 
 
 [5]
 Kay v. Mills, 490 F.Supp. 844, 855 (E.D.Ky.1980) (citing W. DeFuniak, Handbook of Modern Equity Sec. 25 (1956); H. McClintock, Equity Sec. 70 (2d ed.1948); D. Dobbs, Remedies 52-57 (1973))
 
 
 [6]
 Appellant here did not argue the defense of "clean hands." Apparently, it accurately recognized that in a contribution action the plaintiff will almost never have clean hands, since the action is brought as a responsible party, seeking to recoup some of its cleanup costs from other responsible parties. However, the relative culpability of the parties is one of the "equitable factors" the trial court may consider as the trial judge did here
 
 
 [7]
 S. Childress, supra note 5, Sec. 4.16; cf. Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206 (3d Cir.1990); Fuller v. Quire, 916 F.2d 358 (6th Cir.1990); Hopper v. Euclid Manor Nursing Home, Inc., 867 F.2d 291 (6th Cir.1989)
 
 
 [8]
 Cf., In re Chicago, Milwaukee, St. P. & Pac. R.R., 841 F.2d 789 (7th Cir.1988); Charles v. Charles, 788 F.2d 960 (3d Cir.1986); Rivers v. Washington County Bd. of Educ., 770 F.2d 1010 (11th Cir.1985); First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007 (7th Cir.1985); Grand Union Co. v. Cord Meyer Development Co., 761 F.2d 141 (2d Cir.1985)
 
 
 [9]
 See e.g., United States v. Monsanto Co., 858 F.2d 160, 172 (4th Cir.1988), cert. denied, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). In O'Neil v. Picillo, 883 F.2d 176 (1st Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990), the court noted the presence of at least 10,000 barrels of waste at a site, the origin of most of which was undeterminable
 
 
 [10]
 Russo, Contribution under CERCLA, 14 Col.J.Env.L. 267, 276-81 (1989)
 
 
 [11]
 Id. at 286
 
 
 [12]
 Id
 
 
 [13]
 Cf. The Anspec Co., Inc. v. Johnson Controls, Inc., 922 F.2d 1240 (6th Cir.1991)
 
 
 [1]
 The language provided here is from section 3071(a) of H.R. 7020, which does not differ substantially from section 4(f) of S. 1480, except that the Senate bill did not include the sixth factor. These criteria are commonly known as the "Gore Factors," named after Representative Gore who introduced them as part of an amendment to H.R. 7020
 
 
 [2]
 In the compromise version of S. 1480, the explicit contribution provision and apportionment criteria found in section 4(f) were replaced by section 107(e)(2), 42 U.S.C. Sec. 9607(e)(2), which has been interpreted as preserving claims for contribution under CERCLA, even though not explicitly establishing a right to contribution